**UNITED STATES of America,
Appellee–Cross–Appellant,**

v.

**Barry TRUPIN, Defendant–Appellant–
Cross–Appellee.**

**Nos. 524, 713, Dockets 96–1252, 96–1307.**

United States Court of Appeals,
Second Circuit.

Argued Nov. 7, 1996.

Decided June 27, 1997.

---

Judd Burstein, New York City (Sabrina P. Shroff, Burstein & Fass, L.L.P., of counsel), for Defendant–Appellant–Cross–Appellee.

Lewis J. Liman, Assistant United States Attorney, New York City (Mary Jo White, United States Attorney, Guy Petrillo, Assistant United States Attorney, of counsel), for Appellee–Cross–Appellant.

Before LUMBARD, OAKES and PARKER, Circuit Judges.

OAKES, Senior Circuit Judge:

This appeal and cross-appeal involve the conviction of Barry Trupin in the United States District Court for the Southern District of New York, Peter K. Leisure, *Judge*, for a violation of one count of 18 U.S.C. § 2315, charging possession of a stolen Marc Chagall painting. On April 11, 1996, Trupin was sentenced to a term of five months' imprisonment, followed by two years' supervised release with a special condition of five months' house arrest. Trupin's appeal of the district court's decision, *United States v. Trupin*, 1996 WL 50237 (S.D.N.Y. Feb. 8, 1996), brings three primary assertions of error: first, he asserts that § 2315 is unconstitutional under the principles of *United States v. Lopez*, 514 U.S. 549, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995), in that the statute exceeds Congress's authority under the Commerce Clause; second, he argues that § 2315 as applied here is an unconstitutional *ex post facto* law which implicates his Fifth Amendment right to be free from compulsory self-incrimination; and third, he asserts that the trial court's jury instructions contained two key errors. The Government cross-appeals on two issues: (1) that the district court erred by treating the Sentencing Guidelines loss calculation as the value of the painting in 1978 when Trupin illegally purchased it as opposed to its value in 1990 when he sold it; and (2) that the court erred by granting a downward departure based on Trupin's assertedly "aberrant" conduct. We have jurisdiction over Trupin's appeal pursuant to 28 U.S.C. § 1294, and over the Government's cross-appeal under 18 U.S.C. § 3742(b).

We affirm on both the appeal and cross-appeal.

## I

## FACTS

"Le Petit Concert," the Chagall painting in question, was purchased in April 1969 by a Baltimore, Maryland, family. About a year later it and some twenty-two other paintings were stolen.[1] In the 1970s, Barry Trupin was an exceedingly successful businessman involved in structuring and selling tax-leveraged or tax-saving investments, as a result of which he was making millions and acquiring the accoutrements thereof: real estate, a yacht, artworks, and other valuable items for himself and his companies, not limited to a suit of armor worn by Henry II and antique Judaica. Trupin's then spouse introduced Trupin to Raoul Zuniga, an artist apparently of some repute, but limited means. Trupin commissioned Zuniga to create a number of sculptures, to assist in the decoration of Trupin's yacht, and to act as Trupin's advisor with respect to art acquisitions. Trupin rewarded Zuniga generously for his work: not only was he paid a healthy fee for his sculptures and wage for his work in decorating the yacht, he was further commissioned to carve an ornate set of doors for the salon of the yacht. At one point in the 1980s, Trupin even gave Zuniga a new Mercedes convertible.

In the late 1970s, Zuniga obtained "Le Petit Concert," along with some other paintings, from one Angelo Jack Inglesi ("Jack"), and attempted to sell seven of the paintings to Trupin sometime in 1978. Trupin purchased the Chagall for $100,000—which, incidentally, represented the full market value at the time of the sale. We take it that Trupin's brief correctly states the fact when it says that, at that point in Trupin's life, money was no object, and he simply did not refuse to purchase an item he wanted because of its cost. Thus, in context, the obtaining of the Chagall for $100,000 was a fairly minor transaction for Trupin.

We know at least that Zuniga was aware that the painting was stolen, and we find that the record strongly supports the jury's finding that Trupin was also. Zuniga's testimony was that, when he sold the painting and on at least one other occasion, he explicitly told Trupin that the painting was stolen. He also testified that Trupin bought the painting directly from "Jack" at the Waldorf–Astoria, and it was delivered shortly thereafter near Kennedy Airport and taken to the yacht.

---

**1.** There is no suggestion that Trupin played any role in this theft.

The trial judge found Zuniga to be utterly incredible—a down-and-out artist put on retainer and given a car, who repaid Trupin with a stolen painting. Zuniga, it was shown, also had difficulties not only with another art purchaser but with the FBI regarding a stolen Picasso. Furthermore, numerous contradictions permeated his testimony, including the fact that he specifically denied in sworn testimony in 1989 having seen the Chagall hanging in the Trupin company yacht, though subsequently admitted having sold the Chagall to Trupin. Were there no evidence other than Zuniga's testimony, the trial judge surely would not have let Trupin's conviction stand.

The Government, however, introduced other damning evidence at trial showing that Trupin knew the painting was stolen. Tellingly, Trupin kept lengthy and detailed insurance schedules, bills of sale, and appraisals with the many other works of art that he had purchased, yet never insured or maintained any such documents regarding the Chagall. In 1982, an inventory was recorded of all of Trupin's personal property, yet the employee who was directed to photograph and prepare descriptions of the other pieces of art for a catalog was not told about the Chagall (which had by that time been recovered by Trupin from his wife in Connecticut and taken back to the yacht in New York). The Trupin employee responsible for insurance matters knew that the Chagall existed, but when he asked Trupin whether it should be insured, Trupin said, "No," then glared at him and said, "You know." In addition, while Trupin displayed his legitimately-purchased works of art in his company brochures and at reputable museums, the Chagall was installed behind closed doors on the yacht, and not shown to anyone except at a social gathering of lawyers and accountants who worked for him. Moreover, when Trupin sold other possessions, he did so for maximum profit: he contacted specialists in connection with the sale of his auto collection or his boat, and contacted Sotheby's or Christy's in connection with the sale of his other art. Yet, when he determined to sell the Chagall in 1990 (at which time, according to the expert evidence, he could have sold it for over $1 million), he obtained no expert advice whatsoever. Instead, he asked a business acquaintance, who he knew was a convicted felon, to sell the painting privately for $350,000 and to a buyer who would not ask for the seller's identity or the painting's provenance.

Based on these indicia of guilty *mens rea,* we feel comfortable that the jury correctly determined that Trupin was well aware of the painting's shady past. Ironically, however, when Trupin attempted to sell the painting under the above-mentioned "no-questions-asked" terms through his felonious business acquaintance, the dealer/buyer learned that the painting was stolen and notified the FBI.

## II

### DISCUSSION

### A. *Trupin's Appeal*

Title 18, U.S.C. § 2315 provides that "[w]hoever receives, possesses, conceals, stores, barters, sells, or disposes of any goods ... of the value of $5,000 or more ... which have crossed a State or United States boundary after being stolen, unlawfully converted, or taken, knowing the same to have been stolen, unlawfully converted, or taken ..." has committed a felony. We start by noting that Appellant raises no challenge to the sufficiency of the evidence establishing that "the Marc Chagall painting was stolen in or about April 1970 from Baltimore, Maryland, that in the summer of 1979 it was located on [Trupin's] boat which was docked at the 79th Street boat basin [in New York City], that, several months later, in the beginning of 1980 [Trupin] received the painting in Westport, Connecticut, and that [he] brought it back to New York." Appellant also raises no challenge to the sufficiency of the evidence that "Le Petit Concert" was worth more than $5,000 when it was received, that he was told that the painting was stolen when he received it, and thereafter acted in a manner that was consistent only with knowledge that it was stolen, and that he possessed it and sought to dispose of it in March of 1990.

### 1. *United States v. Lopez*

■ Trupin's first challenge is brought under the principles enunciated in *Lopez*. *Lopez*, it will readily be recalled, held that the Gun–Free School Zones Act of 1990, 18 U.S.C. § 922(q)(1)(A), which made it a federal offense to possess a firearm at a place that the possessor knows, or has reasonable cause to believe, is a school zone, was unconstitutional because it exceeded Congress's authority to pass legislation under the Commerce Clause. *Lopez*, 514 U.S. at 551–65, 115 S.Ct. at 1626–32. We first address Trupin's argument that within the strict meaning of *Lopez*, § 2315 unconstitutionally exceeds Congress's authority, before turning to his second point that Congress did not make adequate findings of impact on interstate commerce when amending the act.

We start our analysis with the proposition long recognized and recalled in *Lopez* that there are three "broad" categories of activity that Congress may regulate under the Commerce Clause:

> First, Congress may regulate the use of the channels of interstate commerce. Second, Congress is empowered to regulate and protect the instrumentalities of interstate commerce, or persons or things in interstate commerce, even though the threat may come only from intrastate activities. Finally, Congress' commerce authority includes the power to regulate those activities having a substantial relation to interstate commerce, i.e., those activities that substantially affect interstate commerce.

*Lopez*, 514 U.S. at 558–59, 115 S.Ct. at 1629–30 (citations omitted); *see also Perez v. United States*, 402 U.S. 146, 150, 91 S.Ct. 1357, 1359, 28 L.Ed.2d 686 (1971). We look, then, to see whether § 2315 appropriately falls under the first, second, or third of these areas, keeping in mind that *Lopez* invalidated a statute which analytically fell under the third category, yet failed to pass muster because its subject matter did not have a "substantial relation to interstate commerce."

Trupin's argument is directed at the portions of § 2315 which prohibit "possession" of property that has "crossed a State or United States boundary after being sto-

len...." These two provisions were added by amendment to § 2315 in 1986. Trupin acknowledges that the former statute was a constitutional exercise of Congress's power to regulate the use of the channels of interstate commerce (the first of the three categories outlined in *Lopez*). *See id.*, 402 U.S. at 150, 91 S.Ct. at 1359 (including former § 2315 as an example of Congress's exercise of this first category of power). But Trupin asserts that the addition of "possession" as a crime, particularly in the light of the change of the jurisdictional language from "moving as interstate commerce" to "crossed a State boundary," makes the new provision unconstitutional. He believes that possession of stolen goods that have crossed state lines cannot be reached as a regulation of the channels of interstate commerce. He also asserts that possession alone is not a valid exercise of Congress's power under the third *Lopez* category for substantially the same reason discussed in *Lopez*.

We disagree. We find the Government's position convincing: amended § 2315 does fall within the first of the three *Lopez* categories, i.e., it is a regulation of "use of the channels of interstate commerce," and therefore differs from § 922(q), which fell under the third of those categories. However, even if we were to accept Trupin's view that, by adding "possession" to § 2315 in the 1986 amendment, Congress drew on its power under the third category enumerated in *Lopez*, we would nevertheless find this exercise of power unquestionably constitutional.

First, we look at the history of § 2315 to assess its legitimacy as an exercise of Congress's power to regulate the channels of interstate commerce. As mentioned above, § 2315 was amended on November 10, 1986, to include "possession" of stolen goods that have crossed state lines. Prior to the amendment, the statute did not outlaw "possession" but only receipt, concealment, storing, bartering, selling or disposing of stolen property, and also covered only such property which was "moving as, or which [was] a part of, or which constitute[d] interstate or foreign commerce...." A close look at the history of the changes in the jurisdictional language of § 2315 shows that Trupin's argu-

ment, that the "crossed State boundary" language takes § 2315 out of the purview of the first of the three permissible categories of regulation, is not warranted.

Although the "moving as interstate commerce" requirement of the original statute was generally broadly construed, a number of courts intimated that, if an item once moving was found to have "come to rest," subsequent attempts to receive, conceal, sell, or dispose of the property would not violate the statute's prohibitions. For example, the Fifth Circuit explained that the original thief might transfer property to another person in such circumstances that it could be considered to have left interstate commerce; the court further stated that a stolen object could remain in the destination state for such a length of time that there would be an indication that it had left interstate commerce. *United States v. Tobin,* 576 F.2d 687, 692–93 (5th Cir.1978).[2] *See also, e.g., Lee v. United States,* 363 F.2d 469, 475 (8th Cir.1966); *Corey v. United States,* 305 F.2d 232, 236–38 (9th Cir.1962); *Pilgrim v. United States,* 266 F.2d 486, 488 (5th Cir.1959). *Cf. McElroy v. United States,* 455 U.S. 642, 652–54, 102 S.Ct. 1332, 1338–39, 71 L.Ed.2d 522 (1982) (construing 18 U.S.C. § 2314 in light of commerce clause decisions before 1919).

To forestall this potentially problematic interpretation, the 1985 Congress amended a companion statute, 18 U.S.C. § 2313, the Motor Vehicle Theft Law Enforcement Act, to replace the requirement that a stolen motor vehicle be in interstate commerce with the requirement that it have crossed a state boundary. On June 4, 1985, Senator Thurmond introduced an Act amending § 2315 to track the language of this "sister statute," and called the Act a "package of technical and minor changes to the Comprehensive Crime Control Act of 1984." 131 Cong. Rec. 14166 (1985). The amendment to § 2315 was described as "eliminat[ing] the present requirement that the property still be considered as moving in interstate or foreign commerce at the time the defendant receives, conceals, or disposes of it," a requirement

which, according to Thurmond, was "unnecessarily burdensome and ... unrelated to the blameworthiness of the defendant's conduct." 131 Cong. Rec. 14184 (1985). Thus, the amendment was intended to "technically" correct the potential loophole created by the language "moving in interstate commerce" by changing the "moving" reference to the "crossing" language. *See* H.R.Rep. No. 99–797 (1985), quoted in part in 1986 U.S.C.C.A.N. 6138–57 ("H.R. 5241... makes technical and minor changes in ... provisions of titles 18 and 28 of the United States Code. All of the amendments contained in the bill are uncontroversial." *Id.* at 6139.)

Ironically, however, in the 1986 Congress's considerable zeal to make this "technical" correction via enactment of the Criminal Law and Procedure Technical Amendments Act of 1986, Pub.L. No. 99–646, § 76, 100 Stat. 3618 (Nov. 10, 1986), it enacted a syntactical horror. The enactment caused a *second* paragraph of § 2315 to read "whoever receives, conceals, stores, barters, sells, or disposes of any falsely made, forged, altered or counterfeited securities or tax stamps ... which have crossed a State or United States boundary after being stolen, unlawfully converted or taken, knowing the same to have been so falsely made, forged, altered, or counterfeited." This jumbled jargon was corrected in 1988 by another technical amendment, enacted as a rider to the Anti–Drug Abuse Act of 1988, Pub.L. No. 100–690, § 7048, 102 Stat. 4401 (Nov. 18, 1988), which reconverted the language of the second paragraph to read as before the 1986 amendments.

In the light of this history, we think it improper to attribute much, if any, significance to the difference between the language in the second paragraph and the other paragraphs of § 2315, particularly the first, with which we are here concerned. That the second paragraph was returned to its original language is meaningless, since grammar, not policy, motivated the change. We do not agree with Trupin that the change broadened the scope of § 2315, but think the new lan-

---

**2.** On the other hand, the Fifth Circuit was careful to point out that a stolen item might be concealed so that it could "cool off" or until its price rose, in which case the concealment would

be an integral part of the movement in interstate commerce and the perpetrator could not escape the reach of the statute. *Tobin,* 576 F.2d at 693.

guage made the provision more specific. The new law might reach some conduct that was beyond the scope of the old law, e.g., stolen goods that have come to rest in their destination state. Yet, it also might be construed to exclude some conduct that the old law covered, i.e., wholly intrastate movement of stolen goods that is nonetheless part of commerce. Because the new "crossed" language did not greatly expand the scope of the former § 2315, which is concededly constitutional, but rather clarified exactly what conduct Congress intended to reach, the change did not make the new version of the law unconstitutional. With regard to this statute, therefore, the statutory reference to movement across state boundaries is indistinguishable, for the purpose of constitutional analysis, from a reference to movement in interstate commerce.

Having so held, we do not agree with Trupin that the amendment adding pure "possession" to the litany of § 2315 offenses takes the statute out of the "use of the channels of interstate commerce." Cases such as *United States v. Beuckelaere,* 91 F.3d 781 (6th Cir.1996) (upholding 18 U.S.C. 922(*o*), punishing machine gun possession), and *United States v. Rambo,* 74 F.3d 948–52 (9th Cir.), *cert. denied,* —— U.S. ——, 117 S.Ct. 72, 136 L.Ed.2d 32 (1996) (same), have upheld, as first-category regulation, statutes which prohibit possession alone, and which, unlike § 2315, contain absolutely no reference to either crossing of state lines or movement in interstate commerce. *See Beuckelaere,* 91 F.3d at 783 ("Section 922(*o*) is 'a regulation of the use of the channels of interstate commerce' because it is 'an attempt to prohibit the interstate transportation of a commodity through the channels of commerce.' " (quoting *Lopez,* 514 U.S. at 559, 115 S.Ct. at 1630)). Likewise, and in conjunction with a statutory element of movement across state boundaries, possession alone can certainly be sustained as a legitimate exercise of Congressional power to regulate the "uses and channels of interstate commerce."

For these reasons, we believe that § 2315, as amended, is a legitimate exercise of Congress's power to regulate the channels of interstate commerce.

We next evaluate how amended § 2315 differs from the statute evaluated in *Lopez* even if viewed as a "category three" exercise of the commerce power. Trupin's belief is that the provision of § 2315 which criminalizes possession of stolen goods that have crossed state lines goes too far in that it reaches beyond the regulation of interstate commerce to an act that could easily occur entirely within a single state. A reading of *Lopez,* however, shows that § 2315 and § 922(q) are entirely dissimilar with regard to the connection of their regulated subject matter with interstate commerce. Section 922(q) did not implicate commerce, or activity of a commercial nature. Justice Rehnquist's majority opinion stated that "[s]ection 922(q) is a criminal statute that by its terms has nothing to do with 'commerce' or any sort of economic enterprise, however broadly one might define those terms." *Lopez,* 514 U.S. at 561, 115 S.Ct. at 1630–31. By contrast, § 2315 does concern commerce in that it seeks to eradicate the interstate and international traffic in stolen goods and in doing so to protect and encourage legitimate trade.

When § 2315 was originally passed, Congress had evidence that thieves were using interstate commerce to transport stolen goods and that the possession of goods that had crossed state lines after having been stolen could not be effectively prosecuted by local authorities who did not have access to the original complainant or national subpoena power, much less a strong interest in prosecuting a local recipient of property stolen in another jurisdiction. *See* Sending and Receipt of Stolen Property in Interstate and Foreign Commerce: Hearing before the Committee on the Judiciary of the House of Representatives on H.R. 10287, 70th Cong. 6–7, 36, 38, 42 (Apr. 3 and 4, 1928); Jerome Hall, *Federal Anti–Theft Legislation,* 1 Law & Contemp. Probs. 425, 428–34 (1934); *cf. Dowling v. United States,* 473 U.S. 207, 218–19, 105 S.Ct. 3127, 3134, 87 L.Ed.2d 152 (1985) (discussing § 2314). Thus, the statute in both its first paragraph (dealing with receiving, concealing, storing, bartering, selling, or disposing of goods, wares, merchandise, securities, or money), and second paragraph (dealing with falsely made,

forged, altered, or counterfeited securities or tax stamps) used as its commerce-nexus language the words "moving as, or which are a part of, or which constitute interstate or foreign commerce. . . ." In short, there is substantial evidence that Congress was concerned about a serious problem of illegal, interstate trade when it first enacted § 2315. The 1986 modifications to the statute regarding "possession" are consonant with these concerns, and thus likewise reflect Congress's legitimate power to impact interstate commerce, for the same reasons mentioned above in our discussion of category-one regulation.

■ As the *Lopez* majority opinion itself recognized, Congress may reach intrastate acts as part of "an essential part of a larger regulation of economic activity, in which the regulatory scheme could be undercut unless the intrastate activity were regulated." *Lopez*, 514 U.S. at 561, 115 S.Ct. at 1631. This

principle has been applied to uphold criminal statutes. *See, e.g., Perez*, 402 U.S. 146, 91 S.Ct. 1357, 28 L.Ed.2d 686 (upholding Congress's power to criminalize even entirely local manifestations of loan sharking). Amended § 2315 is a similar law: In seeking to eradicate a problem with an obvious and substantial interstate component, it reaches acts that in some instances might occur in a single locale. *Lopez* does not prevent this, at least when commerce is clearly implicated.

In sum, therefore, although we find Trupin's *Lopez* arguments to be sophisticated and creative, we are yet again led to agree with the Seventh Circuit's sentiment that "[i]t appears that *United States v. Lopez* has raised many false hopes. Defendants have used it as a basis for challenges to various statutes. Almost invariably those challenges fail." *United States v. Bell*, 70 F.3d 495, 497 (7th Cir.1995) (citations omitted).[3]

3. Numerous statutes have been upheld against post-*Lopez* Commerce Clause challenges in this and other courts. For example, the Government cites 18 U.S.C. § 922(g), dealing with the interstate or foreign shipment or transportation of firearms and ammunition. This statute has been upheld against *Lopez* challenges as requiring a showing by the Government that the weapon at issue was shipped or transported in interstate or foreign commerce, or was possessed in or affected commerce, and thus had a "legitimate nexus with interstate commerce." *E.g., United States v. Sorrentino*, 72 F.3d 294, 296 (2d Cir.1995). Another such analog statute is 18 U.S.C. § 2251(a), the Protection of Children Against Sexual Exploitation Act of 1977, which prohibits the use of a minor to produce visual depictions of sexual activity if those depictions are transported in interstate or foreign commerce. This statute was distinguished from the one in *Lopez* as requiring "an identifiable interstate nexus" in *United States v. Sirois*, 87 F.3d 34, 40 (2d Cir.), *cert. denied, ——* U.S. *——*, 117 S.Ct. 328, 136 L.Ed.2d 241 (1996). Finally, 18 U.S.C. § 2119, prohibiting the taking of a motor vehicle with the intent to cause death or serious bodily harm by force, violence, or intimidation when the vehicle has been transported, shipped, or received in interstate or foreign commerce, was upheld in *United States v. Bishop*, 66 F.3d 569, 585–88 (3d Cir.) (relying on *United States v. Bass*, 404 U.S. 336, 92 S.Ct. 515, 30 L.Ed.2d 488 (1971), and *Scarborough v. United States*, 431 U.S. 563, 97 S.Ct. 1963, 52 L.Ed.2d 582 (1977), for the proposition that past transportation provided a sufficient nexus with interstate commerce), *cert. denied, ——* U.S. *——*, 116 S.Ct. 681, 133 L.Ed.2d 529 (1995).

Because Trupin's argument is directed toward the lack of a § 2315 reference to interstate commerce, we focus here upon those which do not contain such a reference. An overwhelming number of courts have upheld such statutes against *Lopez* challenges. (We also note that several such statutes, *e.g.*, 18 U.S.C. § 922(*o*), outlaw simple possession.) Furthermore, several have been upheld despite being held not to be third-category cases. *See, e.g., Beuckelaere*, 91 F.3d 781 (upholding 18 U.S.C. § 922(*o*), which prohibits possession of machine guns, as a first-category regulation); *Rambo*, 74 F.3d at 952 (same); *United States v. Rybar*, 103 F.3d 273 (3d Cir.1996) (same, upheld as third-category regulation); *United States v. Kenney*, 91 F.3d 884, 885–91 (7th Cir.1996) (same, upheld as third-category regulation); *United States v. Wilks*, 58 F.3d 1518, 1521 (10th Cir.1995) (same, upheld as second-category regulation); *United States v. Wall*, 92 F.3d 1444, 1449–52 (6th Cir.1996) (upholding 18 U.S.C. § 1955, which prohibits illegal gambling operations, as a third-category regulation), *cert. denied, ——* U.S. *——*, 117 S.Ct. 690, 136 L.Ed.2d 613 (1997); *United States v. Michael R.*, 90 F.3d 340, 344–45 (9th Cir.1996) (upholding 18 U.S.C. 922(x)(2), which prohibits knowing and intelligent possession of a handgun by a juvenile, as a third-category regulation); *United States v. Staples*, 85 F.3d 461, 462–63 (9th Cir.) (upholding 18 U.S.C. § 924(c)(1), which prohibits use or carrying of a firearm during a crime of violence or drug trafficking, using third-category regulation analysis), *cert. denied, ——* U.S. *——*, 117 S.Ct. 318, 136 L.Ed.2d 233 (1996); *United States v. Leshuk*, 65 F.3d 1105, 1111–12 (4th Cir.1995) (upholding 21 U.S.C. § 841(a)(1), the Comprehensive Drug Abuse Prevention and Control Act of 1970, as a third-category regulation); *United States v. Parker*, 108 F.3d 28 (3rd Cir.1997) (up-

## 2. *Ex Post Facto/Fifth Amendment*

■ We reject Trupin's argument that § 2315 as amended in 1986 was applied to him in violation of the *ex post facto* clause and the Fifth Amendment. Rather, as the district court found, Trupin was prosecuted for the portion of his continuing offense that occurred after the date of the amendment of the statute. His prosecution is hence not barred by the *ex post facto* clause. In *Samuels v. McCurdy*, 267 U.S. 188, 45 S.Ct. 264, 69 L.Ed. 568 (1925), the Supreme Court held that the Georgia prohibition statutes making it illegal to "control or possess" liquor could properly be applied to a defendant who had lawfully acquired the liquor before the effective date of the statute, and continued the possession for several years after the change in the law. The court reasoned that "[t]he penalty [the statute] imposes is for continuing to possess the liquor after the enactment of the law." *Id.* at 193, 45 S.Ct. at 265 (citing *Chicago & Alton R.R. Co. v. Tranbarger*, 238 U.S. 67, 35 S.Ct. 678, 59 L.Ed. 1204 (1915)) (statutes imposing criminal penalties for continuing conduct will be construed to allow a reasonable grace period for compliance so as to avoid *ex post facto* concerns). Similarly, here, the offense charged was for continuing to possess the stolen painting after the 1986 amendment. Much more recently, we held in *United States v. Harris*, 79 F.3d 223, 230

holding 18 U.S.C. § 228 (1994), the Child Support Enforcement Act (CRSA), as a third-category regulation); *United States v. Bongiorno*, 106 F.3d 1027, 1031 (1st Cir.1997) (same, upheld as a second-category regulation); *United States v. Sage*, 92 F.3d 101, 106–07 (2d Cir.1996) (same, upheld as a second-category regulation), *cert. denied*, — U.S. —, 117 S.Ct. 784, 136 L.Ed.2d 727 (1997); *Terry v. Reno*, 101 F.3d 1412, 1415–18 (D.C.Cir.1996) (upholding 18 U.S.C. § 248, the Freedom of Access to Clinic Entrances Act (FACE), as a third-category regulation); *United States v. Dinwiddie*, 76 F.3d 913, 919 (8th Cir.) (same, upholding as either second or third-category regulation), *cert. denied*, — U.S. —, 117 S.Ct. 613, 136 L.Ed.2d 538 (1996); *United States v. Wilson*, 73 F.3d 675, 679–88 (1995) (same, upholding as third-category regulation and declining to address applicability of second category), *cert. denied*, — U.S. —, 117 S.Ct. 47, 136 L.Ed.2d 12 (1996); *Cheffer v. Reno*, 55 F.3d 1517, 1519–21 (11th Cir.1995) (same, upholding implicitly as third-category regulation); *American Life League, Inc. v. Reno*, 47 F.3d 642, 647 (4th Cir.) (same, upheld without discussion of

(2d Cir.), *cert. denied*, — U.S. —, 117 S.Ct. 142, 136 L.Ed.2d 89 (1996), that the *ex post facto* clause was not violated by the continuing financial crimes enterprise statute, 18 U.S.C. § 225. Judge Miner's opinion in *Harris* reached this holding, in reliance upon ample Second Circuit precedent, because the jury must have considered post-enactment conduct in reaching its verdict. *See id.* at 229 (citing *United States v. Torres*, 901 F.2d 205, 226 (2d Cir.1990); *United States v. Duncan*, 42 F.3d 97, 104 (2d Cir. 1994)). *See also United States v. Borelli*, 336 F.2d 376, 386 n. 5 (2d Cir.1964) (Friendly, *J.*).

As we have said, the relevant conduct in this case was not the receipt of the painting which Trupin took from Westport, Connecticut, to New York in 1980, but the continued possession of it after the 1986 amendment. Trupin could have avoided conviction for possession by ceasing his possession within a reasonable time after the 1986 amendment. *See Chicago & Alton*, 238 U.S. at 74, 35 S.Ct. at 680–81; *see also* 1 Wayne R. LaFave & Austin W. Scott, Jr., *Substantive Criminal Law*, § 2.4(b), at 142 & n.53 (1986).[4] He could have returned the painting to its owners anonymously or through his attorney, or delivered it to a legitimate custodian of lost and stolen art. His failure to take any such remedial steps after the change in the federal law subjects him to conviction without

categories), *cert. denied*, — U.S. —, 116 S.Ct. 55, 133 L.Ed.2d 19 (1995). Several of these statutes, e.g., the CSRA, include language similar to that in § 2315 regarding the crossing of state lines. The broad range of these holdings and their rationales further bolster our belief that the "crossing of state lines" amendment in no way moved § 2315 out from the first category of areas which Congress may permissibly regulate, and that even if it were a third-category case, it would be within Congress's dominion.

Finally, we call attention to Judge Ross's fine opinion in *United States v. Friedman*, No. 95–CR–192(S–3)(ARR), 96–CR–182(ARR), 1996 WL 612456 (E.D.N.Y. Aug.13, 1996), which reached substantially the same result as we do here with regard to § 2315 itself, and held that the statute could be upheld under any of the three categories of permissible Congressional regulation. *Id.* at *3.

4. Because Trupin took no step to comply with the amended federal law, we need not decide what length of time would be reasonable as a grace period to permit compliance.

implicating the *ex post facto* clause. *See United States v. Alkins,* 925 F.2d 541, 549 (2d Cir.1991) (amendment to mail fraud statute was not applied to defendants in violation of *ex post facto* clause where defendants could have taken steps to prevent the final element of the crime from occurring after the effective date of the statute).

■ Trupin responds that returning the painting after the 1986 amendment would attest to his illegal possession in the interim, thereby implicating his Fifth Amendment privilege against self-incrimination. Trupin, however, is not in the same situation as that faced by the defendants in *United States v. Kuh,* 541 F.2d 672 (7th Cir.1976), or *United States v. King,* 402 F.2d 694 (9th Cir.1968). In those cases, the relevant statute contained a provision criminalizing the failure to inform authorities of criminal conduct. The Seventh and Ninth Circuits both held that such a provision violated those defendants' Fifth Amendment rights by forcing them to report information which could incriminate them. But Trupin had options, as just listed above, which would have enabled him to cease his possession of stolen goods within a reasonable time after such possession was criminalized without subjecting him to further criminal proceedings. The *Kuh* and *King* defendants had no such options available to avoid self-incrimination. Trupin's conviction thus violates neither the Fifth Amendment nor the *ex post facto* clause.

### 3. *Jury Instructions*

Trupin also argues that the district court's jury instructions were erroneous in two respects: First, the court should have required the jury to find that Trupin's interstate transportation of the painting had a commercial impact on interstate commerce; second, the instructions erroneously stated that the jury could find him guilty if he either possessed, stored or concealed the painting, or sold, bartered or disposed of it. Objection to the instruction as to commercial impact or commercial purpose was not preserved by trial counsel either at trial or in post-trial motions and, indeed, was a charge rejected in *Sirois,* 87 F.3d at 39–40.

■ The second objection is more complicated. The court initially proposed an instruction, taken from the standard jury instructions contained in L. Sand, J. Siffert, W. Laughlin, and S. Reiss, *Modern Federal Jury Instructions* (1995), which included reference to the receipt of stolen goods. Trupin's counsel objected to that instruction. Following an out-of-court discussion between Trupin's counsel and the prosecutor, Trupin's counsel did not object to a revised instruction which deleted the verb "received." The resulting instruction read as follows: "[Y]ou may not find the defendant guilty unless you agree, unanimously, that the defendant possessed, concealed or stored the property or that the defendant bartered, sold, or disposed of the property. It is not enough that some of you find only that the defendant possessed or stored the property and the rest of you find only that the defendant disposed of or sold the property." Arguably, therefore, Trupin has waived his right to appeal that instruction. Later, however, Trupin raised the contention that the court's instruction violated his right to a unanimous verdict.

While we believe that Trupin waived his appeal on this point, we need not decide whether his apparent acquiescence to the instruction as given constituted waiver, because we find no error in the instruction as given. We have, time and again, held that a general charge regarding unanimity is ordinarily sufficient to protect the defendant's right to a unanimous verdict. *United States v. Harris,* 8 F.3d 943, 945 (2d Cir.1993); *United States v. Natelli,* 527 F.2d 311, 324–25 (2d Cir.1975). *Compare United States v. Gipson,* 553 F.2d 453, 458–59 (5th Cir.1977) (describing § 2313 as referring to six acts in two distinct conceptual groupings—receiving, concealing and storing on the one hand—bartering, selling and disposing on the other—which could permit the jury to find the *actus reus* element unanimously despite difference in belief as to which *intra* group act the defendants committed, but reversing conviction where trial judge gave instruction that permitted jury to find *actus reus* element unanimously despite difference in belief that *inter* group acts occurred), *cited approv-*

*ingly in United States v. Peterson,* 768 F.2d 64, 67 n. 2 (2d Cir.1985).

Thus, we affirm the defendant's conviction.

### B. The Government's Cross–Appeal

#### 1. Sentencing Guidelines—Loss Value Calculation

On cross-appeal, the Government first asks us to vacate the judgment and remand for resentencing on the basis that the Guidelines "loss" attributable to Trupin cannot be based on the fair market value of the painting in 1978 when Trupin purchased it, but must be based on its fair market value in 1990, the year he last possessed and attempted to sell the painting. The Government argues (and it is undisputed) that at the time Trupin gave the painting to his representative to sell, its fair market value was between $1 and $1.5 million, much appreciated from the $100,000 which he had paid for it.

In deciding this point, the district court relied upon the November 1, 1993, amendment to Application Note 2 to § 2B1.1 of the Sentencing Guidelines.[5] This amendment provided that "[l]oss does not include the interest that could have been earned had the funds not been stolen." U.S. Sentencing Guidelines Manual [hereinafter U.S.S.G.] § 2B1.1, Application Note 2 (1993). Evidently, the district court analogized the increase in the value of the painting to such interest. This analogy has found some support in *United States v. Arjoon,* 964 F.2d 167, 172 (2d Cir.1992) (defining, in the context of not taking into account property returned by the defendant to the victim voluntarily or before the theft was discovered, "loss" to mean "not the ultimate harm suffered by the victim, but ... rather the value of what was taken." (citing *United States v. Brach,* 942 F.2d 141, 143 (2d Cir.1991))). On the other hand, the Government points to cases such as *United States v. Henderson,* 19 F.3d 917, 928 (5th Cir.1994), where the court found "that this commentary sweeps too broadly," and that "[i]nterest should be included if, as here, the victim had a reasonable expectation of receiv-

ing interest from the transaction." (citation omitted).

Unfortunately, the Sentencing Commission has not explicated this amendment to § 2B1.1. *See* U.S.S.G. Appendix C, amendment no. 482 at 318 (1993). We think that in the absence of such guidance, a district court could properly go either way on this question. The 1989 Manual Application Note 3 states that the amount of loss "need not be determined with precision, and may be inferred from any reasonably reliable information available, including the scope of the operation." U.S.S.G. § 2B1.1, n.3 (1989). *See United States v. Wilson,* 900 F.2d 1350, 1356 (9th Cir.1990) ("where goods have no readily ascertainable market value, any reasonable method may be employed to ascribe an equivalent monetary value to the items." (internal citations and quotations omitted)). We are required to give "due deference to the district court's application of the guidelines to the facts," 18 U.S.C. § 3742(e), and will not overturn the court's ruling unless there has been an·abuse of discretion. *United States v. Parker,* 903 F.2d 91, 103 (2d Cir.1990). Though the appreciation in a painting's base value is not necessarily the same as interest, the concepts are similar. In this case, where Trupin did not attempt to sell the painting at its full market value, we will not second-guess the district court's decision to value the painting at the lower amount, though we do not hold that, as a matter of law, appreciation in value can *not* be considered when calculating loss.

#### 2. Sentencing Guidelines—"Aberrant Conduct"

The Government also argues on cross-appeal that Trupin should not have been given a downward departure of five levels on the basis that his conduct was "aberrant." The district court made clear that it would only consider applying this downward departure as an alternative to the $100,000 loss calculation. Because we agree with the court's rationale relating to the amount of loss, we

---

5. Certainly the court's decision to rely upon the 1993 Application Note to interpret the 1989 Guidelines is reasonable given that the later ver- sion does not contradict the earlier, but, rather, sheds light on the policy of the Sentencing Commission.

need not address the aberrant conduct departure issue.

We thus affirm the cross-appeal.

## CONCLUSION

Judgment affirmed.

LUMBARD, Circuit Judge, concurring in part and dissenting in part:

I concur in the majority's affirmance of Trupin's conviction, but write separately because I view the application of *United States v. Lopez*, 514 U.S. 549, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995), to this case somewhat differently than does the majority, and because I dissent from the affirmance of Trupin's sentence, which fails to establish adequate principles for sentencing possession offenses. I would remand for resentencing.

The statutory provision at issue here—18 U.S.C. § 2315's prohibition of possession of certain stolen property—is a constitutional exercise of Congress's commerce power. Under *Lopez* Congress's commerce clause power extends to three categories of activity:

> First, Congress may regulate the use of the channels of interstate commerce. Second, Congress is empowered to regulate and protect the instrumentalities of interstate commerce, or persons or things in interstate commerce, even though the threat may come only from intrastate activities. Finally, Congress' commerce authority includes the power to regulate those activities having a substantial relation to interstate commerce, i.e., those activities that substantially affect interstate commerce.

*Id.* at 558–59, 115 S.Ct. at 1629–30 (citations omitted). Two types of regulation fall within *Lopez's* third category: first, "regulations of activities that arise out of or are connected with a commercial transaction, which viewed in the aggregate, substantially affects interstate commerce," *id.* at 561, 115 S.Ct. at 1631, and second, those regulations containing a jurisdictional element "which would ensure, through case-by-case inquiry, that the [activity] in question affects interstate commerce." *Id.*

Section 2315's possession provision can be upheld under *Lopez's* third category as a regulation of an activity that substantially affects interstate commerce. Although possession itself is not a commercial activity, § 2315 as a whole clearly is directed toward regulating interstate commerce in certain stolen property by prohibiting transactions in such property. The statute's possession provision aids that regulatory scheme by criminalizing the demand side of the market in stolen goods, and thus Congress rationally could conclude that the provision is "an essential part of a larger regulation of economic activity, in which the regulatory scheme could be undercut unless the intrastate activity were regulated." *Lopez*, 514 U.S. at 561, 115 S.Ct. at 1631.

For the same reason, however, § 2315's possession provision cannot also be upheld as a first-category regulation of the channels of interstate commerce. The citations in *Lopez* demonstrating that "Congress may regulate the use of the channels of interstate commerce," 514 U.S. at 549, 115 S.Ct. at 1629, each deal with the actual transportation of people or items in interstate commerce. *See Heart of Atlanta Motel, Inc. v. United States*, 379 U.S. 241, 256, 85 S.Ct. 348, 357, 13 L.Ed.2d 258 (1964) ("The transportation of passengers in interstate commerce, it has long been settled, is within the regulatory power of Congress, under the commerce clause of the Constitution") (quoting *Caminetti v. United States*, 242 U.S. 470, 491, 37 S.Ct. 192, 196–97, 61 L.Ed. 442 (1917)); *United States v. Darby*, 312 U.S. 100, 114, 61 S.Ct. 451, 457, 85 L.Ed. 609 (1941) ("Congress ... is free to exclude from the commerce articles whose use in the states for which they are destined it may conceive to be injurious"). "Thus, it seems clear that the first category of Commerce Clause authority outlined in *Lopez* concerns Congress's power to regulate, for economic or social purposes, passage in interstate commerce of either people or goods." *United States v. Rybar*, 103 F.3d 273, 288–89 (3d Cir.1996) (Alito, J., dissenting), *petition for cert. filed*, 65 U.S.L.W. 3755 (U.S. April 30, 1997) (No. 96–1738).

Possession, as opposed to transportation, does not use the channels of interstate com-

merce, and therefore does not fall within the first *Lopez* category. *See United States v. Kenney,* 91 F.3d 884, 889 (7th Cir.1996) ("[A]lthough it may be true that Congress must regulate . . . even mere possessions . . . in aid of its prerogative of preventing the misuse of the channels of interstate commerce, the regulation still regulates much more than the channels of commerce. This rationale is therefore an aspect of Congress's broader power to regulate things 'affecting' interstate commerce."). Consequently, a majority of circuits that have considered *Lopez* challenges to other possession offenses have upheld the respective statutes only under *Lopez 's* third category. *See United States v. Knutson,* 113 F.3d 27, 31 (5th Cir.1997) (addressing 18 U.S.C. § 922(*o*)); *Rybar,* 103 F.3d 273, 283 ("we hold, that the authority of Congress to enact § 922(*o*) under the Commerce Clause can be sustained under the third category identified" in *Lopez* ); *Kenney,* 91 F.3d 884 (§ 922(*o*)); *United States v. Michael R.,* 90 F.3d 340 (9th Cir.1996) (18 U.S.C. § 922(x)(2)) [1]. Like those statutes, § 2315 by its terms does not regulate the passage of goods. Rather, by prohibiting transactions in, and even possession of, property once it has been in the channels of interstate commerce, the statute inhibits— i.e., affects—interstate commerce in such property without directly regulating the property's passage in the channels of commerce. As a result, it too can be upheld only under *Lopez 's* third category.

Although I agree for the most part with the district court's sentencing approach, I dissent from the majority's affirmance of Trupin's sentence, which fails to set forth principles under which Trupin should have been sentenced. The commentary to the applicable sentencing guideline, section 2B1.1, states that

> [l]oss means the value of the property taken, damaged, or destroyed. . . . Loss does not include the interest that could have been earned had the funds not been stolen. . . .

In stolen property offenses (receiving, transporting, transferring, transmitting, or possessing stolen property), the loss is the value of the stolen property determined as in a theft offense.

U.S.S.G. § 2B1.1, comment. (n. 2). Underlying this commentary is a general policy favoring loss valuation as of the time the defendant first took the property. Thus, in typical theft and fraud cases, we have routinely read this application note, and the analogous commentary to section 2F1.1, *see* U.S.S.G. § 2F1.1, comment. (n. 7), to require calculation of loss based on the value of the property taken, without regard to subsequent disposal or return of the stolen property or funds. *See United States v. Arjoon,* 964 F.2d 167, 172 (2d Cir.1992) ("'Loss' is, therefore, not the ultimate harm suffered by the victim, but is rather the value of what was taken."); *United States v. Brach,* 942 F.2d 141 (2d Cir.1991).

The commentary's instruction that loss not include interest that could have been earned on stolen funds, relied upon by the district court here, furthers this policy by excluding from the loss calculation amounts that were speculative and prospective when the defendant first took or received the property or funds. Thus, those circuits that have interpreted the interest provision as allowing *promised* rates of return to be included in the loss figure have done so precisely because the commentary "allows for a distinction to be made between the types of interest based on the level of certainty with which the interest was due. . . . Inherent in th[e guideline's interest exclusion] is a degree of speculation. . . ." *United States v. Allender,* 62 F.3d 909, 917 (7th Cir.1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 781, 133 L.Ed.2d 732 (1996); *see United States v. Goodchild,* 25 F.3d 55, 65–66 (1st Cir.1994) (including contractually-specified interest in loss figure); *United States v. Henderson,* 19 F.3d 917, 928 (5th Cir.1994) (same); *United States v. Lowder,* 5 F.3d 467, 471 (10th Cir. 1993) (same); *cf. United States v. Hoyle,* 33 F.3d 415, 419 (4th Cir.1994) (reversing inclu-

---

1. As there seems no relevant basis for distinguishing the possession provision in § 922(x)(2) from that in § 922(*o*), *Michael R.* implicitly conflicts with *United States v. Rambo,* 74 F.3d 948

(9th Cir.1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 72, 136 L.Ed.2d 32 (1996), cited by the majority, which upheld § 922(*o*) under *Lopez 's* first category.

sion in loss figure of interest which represented only time-value of stolen funds).

In light of this policy of excluding loss which was speculative when the defendant took the property, the most sensible reading of the commentary's directive that loss in possession cases be "determined as in a theft offense" is that loss means, not the value of the property when the defendant's possession of it ceased, but the "value of the property taken"—i.e., at the time the defendant took it. Subsequent appreciation in the property's value should not be included because, like the interest excluded from the Guidelines's definition of loss, it is speculative. Indeed, to read the guidelines and commentary as requiring that loss be valued as of the time possession terminated would measure loss by the ultimate harm to the victim, the precise scheme that we have rejected in *Arjoon* and other cases.

The government's argument to the contrary errs both as a matter of interpretation and policy. The government relies largely on the relevant conduct principles of the Guidelines, under which a defendant is responsible for "*all* harm that resulted from the acts and omissions," U.S.S.G. § 1B1.3(a)(3) (emphasis added), that occurred during the offense of conviction. But this general definition of relevant conduct factors is qualified by the commentary to section 2B1.1, which, as explained above, directs that loss be measured as of the time the stolen property was taken. *See Stinson v. United States*, 508 U.S. 36, 38, 113 S.Ct. 1913, 1915, 123 L.Ed.2d 598 (1993) ("commentary in the Guidelines Manual that interprets or explains a guideline is authoritative unless it . . . is inconsistent with, or a plainly erroneous reading of, that guideline.") Moreover, Guidelines § 1B1.3(a)(3) does not even support the government's argument. The general prescription that "all harm" resulting from the offense be included dictates that property in a possession offense be valued, not so much as of the date of the termination of the offense, but at its highest value during the course of the offense. Thus, had the value of the Chagall risen even higher between 1978 and 1990 before settling at its 1990 value, reliance on section 1B1.3(a)(3)

would support a loss valuation at the highest figure, which, no less than the value of the painting in 1990, would be "harm that resulted from the acts and omissions" of Defendant. The government does not urge that loss be determined by reference to the property's highest value during the course of the offense. But its logic nonetheless compels this result rather than valuation of the painting as of the termination of Trupin's offense, and thus compels rejection of the government's argument.

Under ordinary circumstances, therefore, the loss from Trupin's offense would be measured as of 1986, when the offense for which he was convicted began. Given that Trupin actually came into possession of the painting in 1978, it would be within the district court's discretion under the Sentencing Guidelines' relevant conduct provisions to choose the 1978 figure. *See* U.S.S.G. § 1B1.3 (stating relevant conduct principles). But the record does not reflect that the district court contemplated the possibility of using a figure from 1986 and consciously chose instead to consider the 1978 figure. As a result, barring reliance on the district court's alternative basis for arriving at Trupin's adjusted offense level—a downward departure which need not be addressed in light of the majority's disposition of the sentence—I would remand the case for resentencing in light of the foregoing principles.